IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
PLANO DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 13-41815 |
| | § | |
| MED-DEPOT, INC. d/b/a HOSPICE SOURCE, | § | (Chapter 11) |
| | § | |
| Debtor | § | |
| | § | Case No. 13-41816 |
| In re: | § | |
| | § | (Chapter 11) |
| MED-DEPOT HOLDINGS, INC., | § | |
| | § | |
| Debtor | § | JOINT ADMINISTRATION |
| | § | REQUESTED |
| | § | |
| | § | **HEARING DATE:  July 31, 2013** |
| | § | **HEARING TIME:  9:30 a.m.** |

**EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING USE OF CASH COLLATERAL, (B) PROVIDING ADEQUATE PROTECTION TO PRE-PETITION SECURED LENDERS, (C) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING, AND (D) GRANTING LIENS, SECURITY INTERESTS, AND SUPER-PRIORITY EXPENSE CLAIMS**

**TO THE HONORABLE  BRENDA T. RHODES, U.S. BANKRUPTCY JUDGE:**

COMES NOW Med-Depot, Inc. d/b/a Hospice Source ("Med-Depot") and Med-Depot Holdings, Inc. ("Holdings" and collectively with Med-Depot, the "Debtors"), the debtors-in-possession in the above styled and numbered bankruptcy cases (the "Bankruptcy Cases"), and file their Emergency Motion for Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Providing Adequate Protection to Pre-Petition Secured Lenders, (C) Authorizing Debtors to Obtain Postpetition Financing, and (D) Granting Liens, Security Interests, and Super-Priority Expense Claims (the "Motion") and in support thereof respectfully stating as follows:

## I.   <u>RELIEF REQUESTED</u>

1.     By this Motion, the Debtors respectfully request the entry of an interim order, substantially in the form submitted herewith, and a final order, pursuant to Sections 361, 362, 363, and 364 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b)-(c):

(a)     authorizing Debtors to use Cash Collateral[1] on an interim basis in accordance with the Budget attached hereto as "**Exhibit 1**" (the "**Budget**")[2] pursuant to Section 363(c) of the Bankruptcy Code and Fed. R. Bankr. P. 4001(b)(2) and as set forth herein;

(b)     authorizing and granting adequate protection to the Pre-Petition Secured Lenders (as hereinafter defined), in the form of replacement liens, adequate protection claims, and adequate protection payments pursuant to Sections 361, 363(e), and 507(b);

(c)     to accommodate any shortfall in available Cash Collateral by authorizing Debtors to obtain post-petition financing from Texas Capital Bank, National Association ("**TCB**"), Westbury Investment Partners SBIC, LP ("**Westbury**"), and Crothers Management, Inc. ("**Crothers**")[3] (collectively, TCB, Westbury, and Crothers, the "**DIP Lenders**") in the total principal amount of approximately $550,000, of which $50,000 to be funded by TCB, $250,000 to be funded by Westbury, and $250,000 to be funded by Crothers;

(d)     authorizing the Debtors to execute and enter into the DIP Documents[4] and any and all such other documents contemplated therein with the DIP Lenders and to perform such other and further acts as may be required in connection with the DIP Documents;

(e)     granting security interests, liens, and super-priority claims to the DIP Lenders, including (i) super-priority claims pursuant to Section 364(c)(1) of the Bankruptcy Code; (ii) senior first liens in the Debtors' pre-petition unencumbered assets, if any, pursuant to Section 364(c)(2); (iii) pursuant to Section 364(d)(1) first priority liens, *pari passu* with TCB's pre-petition liens in the Debtors' pre-petition assets that are subject to TCB's pre-

---

[1] The term "*Cash Collateral*" shall have the meaning as defined in 11 U.S.C. § 363(a).

[2] The Debtors reserve the right to amend the Budget prior to the Interim Hearing.

[3] Crothers is owend by Mike Crothers, and insider of Evolve Capital.  Evolve Capital is an affiliate of the Debtor.

[4] The term "**DIP Documents**" shall mean those certain Post-Petition Credit Agreements, Security Agreements, Revolving Promissory Notes and such other documents contemplated therein as more fully described in the Motion and approved by this Order to be entered into between the Debtors and the DIP Lenders.

petition liens, subject only to the Carve-Out (as hereinafter defined); and
(iv) pursuant to Section 364(c)(3) junior liens on property of the estate that
is subject to any prior existing, validly perfected and non-avoidable liens,
if any, that are senior in priority to TCB's pre-petition liens; and

(f)     granting such other and further related relief as detailed herein.

### Rule 4001(b)(1)(B) and 4001(c)(1)(B) Summary

2.     The following summary is qualified by reference to the more detailed provisions

of the DIP Documents and the Interim Order.

| **Provision** | **Summary** | **Location in Documents** |
|---|---|---|
| **Lenders** | DIP Lenders | Post-Petition Credit Agreement Preambles |
| **Borrower** | Debtors | Post-Petition Credit Agreement Preambles |
| **Loan Amount** | Approximately $550,000.00 | Post-Petition Credit Agreement Preambles |
| **Purpose of Loan** | The proceeds of the proposed Loan will be used, in accordance with the terms of a Budget (defined below) to: (i) provide working capital for, and for other general corporate purposes of the Debtors during its bankruptcy case; and (ii) fund the costs and expenses incurred by the Debtors in connection with the administration and prosecution of their cases | Section 2.4 of the Post-Petition Credit Agreements |
| **Interest Rate** | 5.5% | Section 1.1 of the Revolving Note Agreement |
| **Commitment Fee** | $7,500 | Section 1.1 of the Post-Petition Credit Agreements |
| **DIP Lender Fees** | Standard | Section 11.1 of the Post-Petition Credit Agreements |
| **Termination Date** | 11:00 A.M. Dallas, Texas time on the earliest of (a) the effective date of a plan of reorganization of Borrowers | Definition of Termination Date on Page 10 of Post-Petition |

| | | |
|---|---|---|
| | confirmed by the Court, (b) November 23, 2013, or (c) the entry of an order of dismissal or conversion of the Debors' cases | Credit Agreements |
| **Amortization** | None. | |
| **Security** | Pursuant to sections 364(c)(2), valid, binding, enforceable, non-avoidable and automatically perfected, security interests and liens upon all property of the estate that is not otherwise subject to a valid, perfected pre-petition lien, and any and all proceeds thereof.<br><br>Pursuant to sections 364(c)(2) and (3), valid, binding, enforceable, non-avoidable and automatically perfected, security interests and liens upon all existing and after acquired tangible and intangible personal property of the Debtors that is subject to valid, perfected pre-petition liens and any and all proceeds thereof. Such DIP Liens shall be equal in priority with the first priority prepetition liens held by TCB. Such DIP Liens, however, shall be subject to any prior existing, validly perfected and non-avoidable liens that are senior in priority to TCB's pre-petition liens.<br><br>Pursuant to section 364(d)(1), the DIP Liens shall be senior in priority to the prepetition second priority liens held by Westbury.<br><br>Notwithstanding anything to the contrary herein above in this paragraph, the DIP Liens shall exclude and not extend to any and all causes of action, if any, arising under Chapter 5 of the Bankruptcy Code. | Paragraph 29(a) – (d) of the Proposed DIP Order |
| **Super-Priority Claim** | Except to the extent expressly set forth in respect of the Carve-Out, pursuant to | Paragraph 27 of the Proposed DIP Order |

| | | |
|---|---|---|
| | section 364(c)(1) of the Bankruptcy Code all of the DIP Obligations shall constitute allowed senior administrative expense claims (the "**Super-Priority Claims**") against each of the Debtors with priority over all valid claims, administrative expenses, adequate protection claims, and all other valid claims against each of the Debtors, now existing or hereafter arising, of any kind whatsoever | |
| **Carve-Out** | "Carve-Out" means:   (a) prior to the occurrence of an Event of Default or the Termination Date[5], the payment of allowed professional fees and expenses by the professionals retained pursuant to Sections 327, 363, or 1103(a) of the Bankruptcy Code by the Debtors and, if appointed, the Official Committee of Unsecured Creditors in these Chapter 11 Cases (collectively, the "**Estate Professionals**") shall only be paid to Estate Professionals in the amounts actually incurred by each such Estate Professional, but in no event shall such amounts exceed the amounts detailed in the Budget, (b) upon the occurrence of an Event of Default or the Termination Date, the payment of subsequently incurred fees and expenses by the Estate Professionals in a total amount not to exceed $50,000, plus any such allowed professional fees that are accrued and unpaid (including any holdbacks) as of the earlier of an Event of Default or the Termination Date as authorized in the Budget, minus any retainers still being held and available for application to the outstanding professional fees and expenses, provided that nothing herein shall be deemed a waiver of the rights of | Paragraph 28 of the Proposed DIP Order |

[5] The term "**Termination Date**" shall have the meaning set forth in the DIP Documents.  For purposes of this Order, in no event shall the Termination Date extend beyond November 23, 2013 (which is 120 days from the Petition Date) without the express consent of each of the DIP Lenders.

|  |  |  |
|---|---|---|
|  | the Lenders to object to any requests for allowance of any such fees or expenses, and (c) fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) or to the Clerk of the Bankruptcy Court |  |
| **Surcharge Waiver** | No costs or expenses of administration which have been or may be incurred in the Debtors' cases shall be charged against the Collateral, the Administrative Agent, the DIP Lenders, or any of their respective claims pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the consent of the Administrative Agent or the DIP Lenders, and no such consent shall be implied from any other action, inaction, or acquiescence by the Administrative Agent or any of the DIP Lenders. |  |
| **Budget** | See Exhibit 1 hereto. |  |
| **Conditions Precedent to Interim Funding** | The obligation of the DIP Lenders to make interim funding available under the DIP Facility will be subject to customary closing conditions, including, and entry of an Interim Order by the Bankruptcy Court authorizing interim financing. | Section 5.1 of the Post-Petition Credit Agreements |
| **Conditions to Full Funding** | The obligation of the DIP Lenders to make all funds available under the DIP Facility will be subject to customary closing conditions, including, and entry of a Final Order by the Bankruptcy Court authorizing the DIP Facility. | Section 5.2 of the Post-Petition Credit Agreements |
| **Representations and Warranties** | Standard. | Section 6 of the Post-Petition Credit Agreements |
| **Events of Default** | Standard. | Section 10.1 of the Post-Petition Credit Agreements |
| **Covenants** | Standard. | Sections 7 and 8 of the Post-Petition Credit Agreements |

| Governing Law | Laws of the state of Texas. | Section 11.12 of the Post-Petition Credit Agreements |
|---|---|---|

## II.   JURISDICTION

2.      The Court has jurisdiction over the Application pursuant to 28 U.S.C. §§ 1334 and 157.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.   BACKGROUND

### A.     The Bankruptcy Case

3.      On the date hereof (the "Petition Date"), the Debtors filed their voluntary petitions for relief (the "Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code").  By motion for joint administration, the Debtors have contemporaneously sought administrative consolidation of theses chapter 11 cases.  The Debtors continue to operate their respective businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      The United States Trustee has not yet appointed a creditor's committee, and no trustees or examiners have been requested or appointed in the Debtors' chapter 11 cases.

### B.     The Debtors' Corporate Structure and Business Operations

4.      Med-Depot is an Oklahoma corporation incorporated in 1998 to be a national provider of respiratory therapy and home medical equipment (collectively, "HME") to hospice providers and their patients.  Holdings is a Delaware corporation whose primary asset is its equity in Med-Depot.  Holdings is also an obligor and/or guarantor of certain debt obligations owed by Med-Depot. The principal place of business for both Med-Depot and Holdings is located in Plano, Texas.

5.      Med-Depot's business consists primarily of HME rental, delivery, pickup, and service.  Routinely rented equipment includes hospital beds, oxygen concentrators, nebulizers, suction machines, specialty mattresses, wheelchairs, and other related items.  As of the Petition Date, the Debtors employ approximately 164 employees.  For the twelve-month period ending March 31, 2013, Med-Depot generated net revenue of $14,996,681.

6.      Approximately sixty percent (60%) of Med-Depot's revenues are generated by providing HME to third parties that in turn provide in-home care to patients.  The remaining forty percent (40%) of Med-Depot's revenue is generated by providing HME for use in facility-based care.

7.      Neither Med-Depot nor Holdings is a "health care business" as that term is defined in section 101(27A) of the Bankruptcy Code.

**C.      The TCB Loan Documents**

8.      The Debtors are parties to:  (i) the Amended and Restated Revolving Promissory Note, dated as of May 26, 2011, in the stated principal sum of One Million Five Hundred and 00/100 Dollars ($1,500,000.00) (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "TCB Revolving Note"), by and among Med-Depot and Holdings, as borrowers, and Texas Capital Bank, National Association ("TCB") as lender; (ii) the Term Promissory Note, dated as of May 26, 2011, in the stated principal sum of Three Million and 00/100 Dollars ($3,000,000.00) (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "TCB Term Note"), by and among Med-Depot and Holdings, as borrowers, and TCB as lender; and (iii) the Amended and Restated Credit Agreement, dated as of May 26, 2011, by and among Med-Depot and Holdings, as

borrowers, and TCB as lender (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "TCB Credit Agreement").

9.      Med-Depot is party to the Amended and Restated Security Agreement, dated as of May 26, 2011, by and between Med-Depot, as grantor, and TCB,  as secured party (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Med-Depot/TCB Security Agreement").

10.     Holdings is party to the Amended and Restated Security Agreement, dated as of May 26, 2011, by and between Holdings, as grantor, and TCB,  as secured party (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Holdings/TCB Security Agreement" and, collectively with Med-Depot/TCB Security Agreement, the "TCB Security Agreements").

11.     The TCB Revolving Note, TCB Term Note, TCB Credit Agreement, and TCB Security Agreements are referred to collectively as the "TCB Loan Documents."

12.     Through the TCB Loan Documents, TCB provided a revolving line of credit and term loan to the Debtors in an aggregate amount not to exceed $4,500,000 (the "TCB Loan").

13.     The TCB Loan is secured by the TCB Security Agreements, which purport to grant TCB a security interest in all of the Debtors' personal property (including after-acquired property).  The TCB Security Agreements also, among other things, gives TCB certain control over lock-box and collection accounts established in connection with the TCB Loan Documents.

**D.      The Westbury Loan Documents**

14.     Med-Depot is party to the Secured Term Loan Note, dated as of May 26, 2011, in the stated principal sum of Ten Million Five Hundred and 00/100 Dollars ($10,500,000.00) plus certain interest defined therein (as amended, restated, amended and restated, supplemented or

otherwise modified from time to time, the "Westbury Note"), by and among Med-Depot, as borrower, and Westbury Investment Partners SBIC, LP ("Westbury" and together with TCB, the "Lenders") as lender.

15.     The Debtors are parties to the Credit and Security Agreement, dated as of May 26, 2011, by and among Med-Depot, as borrower, Holdings, as guarantor, and Westbury, as lender and agent (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Westbury Credit and Security Agreement").

16.     Holdings and Westbury are also parties to the Stock Pledge Agreement, dated as of May 26, 2011, by and between Holdings, as grantor, and Westbury, as agent and secured party (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Westbury Stock Pledge Agreement").

17.     The Westbury Note, Westbury Credit and Security Agreement, and Westbury Stock Pledge Agreement are referred to collectively as the "Westbury Loan Documents."

18.     Through the Westbury Note and Westbury Credit and Security Agreement, Westbury provided a term loan to Med-Depot in the original aggregate principal amount of $10,500,000 (the "Westbury Loan").  Westbury asserts that the amount owed under the Westbury Loan Documents as of the Petition Date is approximately $12.36 million.

19.     The Westbury Loan is secured by the collateral defined in the Westbury Credit and Security Agreement, which purport to grant Westbury a security interest in substantially all of Med-Depot's personal property (including after-acquired property).

20.     Holdings' guaranty of the Westbury Loan is secured by the collateral defined in the Westbury Stock Pledge Agreement, which purport to grant Westbury a security interest in Holdings' equity holdings in Med-Depot.

**E.      The Intercreditor Agreement**

21.      The Debtors are party to the Intercreditor Agreement, dated as of May 26, 2011, by and among Med-Depot and Holdings, as borrowers, TCB, as senior lender, and Westbury, as junior lender (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement").  Pursuant to the Intercreditor Agreement, the parties purportedly subordinated Westbury's interests to those of TCB.

**F.      The Invacare Agreement**

22.      Med-Depot is party to the Lease Agreement, dated as of March 20, 2012, by and among Med-Depot, as lessee/grantor, and Invacare Credit Corporation ("Invacare"), as lessor/secured party (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Invacare Agreement").

23.      Pursuant to the Invacare Agreement, Invacare provided certain home medical equipment (HME) that is necessary for the Debtors' operations.  The HME provided pursuant to the Invacare Agreement is referred to collectively as the "Invacare HME."

24.      The Invacare Agreement contains an end-of-lease purchase option of $1, and provides that Med-Depot grants Invacare a first priority security interest[6] in the Invacare HME.

**G.      Events Leading to the Commencement of the Debtors' Chapter 11 Cases**

25.      In the last several years, Med-Depot has been successful in growing its business. Such growth has been accompanied by an increased need for HME, as well as an increase in other necessary expenses.

---

[6] Public records indicate a termination statement and a continuation statement regarding Invacare's interest were recently filed.  The Debtors continue to investigate Invacare's secured status, and reserve all rights related thereto.

26.    Med-Depot's cash flow and earnings are strong.  However, the pressing needs for HME, together with an increase in expenses related to a growth in operations, has caused the Debtors to reach the limits of the TCB Loan.

27.    The Debtors commenced their Cases in order to stabilize operations and maximize value of their assets for the benefit of creditors and other constituencies under chapter 11 of the Bankruptcy Code.

### III.    BASIS FOR RELIEF REQUESTED

**A.    Request for Authority to Use Cash Collateral**

*(i)    The Cash Collateral*

28.    The Debtors have cash and accounts on hand as of the Petition Date and will generate additional cash and accounts postpetition from the operation of their businesses, all of which could constitute cash collateral as that term is defined by section 363(a) of the Bankruptcy Code (as so defined, the "Cash Collateral"), although the Debtors hereby reserve their right to complete an analysis of whether any creditor actually holds a perfected security interest in the Cash Collateral.

29.    The Debtors believe that the Lenders claim an interest in various types of the Debtors' property that would constitute Cash Collateral including the revenue derived from the operation of the Debtors' businesses.  While the Debtors reserve their right to contest any interests asserted by Lenders, including the validity, extent, and priority, for the purposes of the relief requested under this Motion, the Debtors believe the Lenders have a colorable claim to rights in the Cash Collateral.

### (ii)     *Need for Use of Cash Collateral*

30.     The Debtors have an immediate and ongoing need for the use of the Cash Collateral as well as the cash generated by the Debtors from the operation of their businesses postpetition.  Among other things, the Debtors have ongoing obligations to pay for:  (i) employee wages and salaries; (ii) inventory purchases from vendors; (iii) maintenance of delivery fleet; (iv) utilities; and (v) all other expenses related to the operation of the Debtors' business.

31.     Without authority to use Cash Collateral, the Debtors would cease operating to the detriment of the Debtors, the Lender and all other creditors and parties-in-interest.

32.     The Debtors have carefully prepared the Budget to demonstrate that they can operate within fixed budget amounts, while still cash flowing and providing adequate protection for the Lender's interest in the Cash Collateral.  As reflected in the Budget, the Debtors believe that they can generate significant additional income form operating their business.  The Debtors request authority to use Cash Collateral for the purposes stated in the Budget and in the amounts budgeted, subject to a monthly variance of ten percent (10%) in any given line item and five percent (5%) in the aggregate for the purposes of unforeseen and/or emergency expenditures.

### (iii)     *Authority to Use Cash Collateral*

33.     Pursuant to section 363(c)(2) of the Bankruptcy Code, the Debtors may not use the Cash Collateral without the consent of the Lenders or court approval.

34.     Additionally, section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property…proposed to be used…by the [debtor-in-possession], the court, with or without a hearing, shall prohibit or condition such use…as is necessary to provide adequate protection of such interest."

35.    The Court should authorize the Debtors to use Cash Collateral, whether existing on the Petition Date or arising thereafter, pursuant to the Budget.  It is essential to the continued operation of the Debtors that they obtain authority to use Cash Collateral to fund payroll and other operating needs.  Currently the Debtors have little or no available cash or assets that are not allegedly subject to the Lenders' liens and security interests.

36.    Allowing the Debtors to use Cash Collateral will preserve the value of the Debtors' assets as a going concern.  The Debtors' estates will suffer immediate and irreparable harm if they are not authorized to use Cash Collateral during the Interim Period.

**B.**    **Adequate Protection To Pre-Petition Secured Lenders**

37.    ***Adequate Protection Claims***.  Because the Debtors' use of Cash Collateral may result in the diminution of the value of the Cash Collateral and the Pre-Petition Secured Lenders' interests therein, the Debtors request that the Court grant super-priority administrative expense claims against the Debtors' estates for the ratable benefit of the Pre-Petition Secured Lenders, as adequate protection pursuant to Section 507(a)(2) and 507(b) of the Bankruptcy Code, which claims shall be in the amount of any post-petition diminution in the value of the Pre-Petition Secured Lenders' interests in the Cash Collateral from and after the Petition Date (the "***Adequate Protection Claims***").  The Adequate Protection Claims shall have the same priority as the Super-Priority Claims, however, the Adequate Protection Claims shall be subject to the Carve-Out.

38.    ***Replacement Liens***.  As additional adequate protection, and in order to secure the Adequate Protection Claims, the Debtors request that the Pre-Petition Secured Lenders be granted replacement security interests in and liens upon all assets of the Debtors (the "***Replacement Liens***").  The Replacement Liens shall be subordinate to the DIP Liens and any prior existing, validly perfected and non-avoidable liens that are senior in priority to the liens of

the Pre-Petition Lenders.  If granted, the Replacement Liens granted to TCB shall have priority over the Replacement Liens granted to Westbury.  The Replacement Liens shall also be subject to the Super-Priority Claims and Carve-Out.  Notwithstanding anything to the contrary in this paragraph, the Replacement Liens shall exclude and not extend to any and all causes of action, if any, arising under Chapter 5 of the Bankruptcy Code.

39.    *Adequate Protection Payments*.  As additional adequate protection, the Debtors request that the adequate protection payments proposed in the Budget to be made to certain Pre-Petition Secured Lenders (the "*Adequate Protection Payments*") be approved and the Debtors are be authorized and directed to make the Adequate Protection Payments to the Pre-Petition Secured Lenders as detailed in the Budget.

C.    **The Debtors' Need for Postpetition Financing**

40.    It is essential to the Debtors' ability to proceed successfully in this Chapter 11 case that they obtain access to postpetition financing pursuant to Section 364 of the Bankruptcy Code, which is necessary to permit the Debtors to conduct business operations and to maintain and to preserve the property and assets of the Debtors' estates.

41.    The Debtors' operations depend on the uninterrupted flow of inventory and supplies.  The Debtors require a source of funding so that vendors will deliver their goods to the Debtors on credit with confidence that they will be paid when their post-petition invoices come due.

42.    Given the nature of the Debtors' business (including the time lag the Debtors experience in receiving payment from its customers) and the need to ensure an uninterrupted supply of inventory, the value of the Debtors' estates can be preserved only if the Debtors have access to cash to purchase inventory.  Approval of the DIP Financing will not only provide the

Debtors with needed cash, but it also is intended to give vendors the necessary confidence to restore or continue customary trade terms.  The benefit of postpetition trade credit to the Debtors is as significant as the liquidity provided directly by the DIP Financing.

43.     Based on the terms and conditions of the DIP Financing, the arm's-length negotiations with the DIP Lenders, and the lack of any other meaningful alternatives, the Debtors have determined that the DIP Financing offered by the DIP Lenders best suits the Debtors' needs by affording working capital necessary to operate and to support the Debtors' efforts to reorganize.  The Debtors believe that the DIP Financing was entered into in good faith and upon the most favorable terms that could be achieved under the circumstances.

44.     Absent authorization to obtain the DIP Financing, the Debtors will have insufficient funds available to conduct ordinary business operations (including to pay insurance, payroll, employee benefits, rent, utility charges, professionals, and general overhead, and to purchase necessary inventory) and to maintain and preserve the property and assets of the Debtors' estates, which would result in the loss of the value of the Debtors' business and assets. The Debtors believe that the DIP Financing will provide funds sufficient to permit the Debtors to operate their business and to pay their expenses during these Chapter 11 cases.

**D.     The Proposed DIP Financing**

45.     The Debtors have determined, in the exercise of their sound business judgment, that the Debtors require access to post-petition credit on the terms set forth in the Interim Order and the DIP Credit Agreement.  As a result, the Debtors seeks authority to enter into the DIP Credit Agreement with the DIP Lenders to meet its financing needs.

46.     Pursuant to the DIP Credit Agreement, the DIP Lenders will extend post-petition credit to the Debtors in compliance with the budget attached to the DIP Credit Agreement (as it

may be amended from time to time). The Debtors propose to grant to the DIP Lenders: (a) pursuant to Section 364(c)(1) of the Bankruptcy Code, super-priority administrative-expense status, with priority over all costs and expenses of administration of this Chapter 11 case that are incurred under any provision of the Bankruptcy Code; and (b) pursuant to Sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, liens and security interests in all of the Debtors' assets, subject only to certain permitted liens and the Carve Out.

**E.     Request for Approval of the DIP Financing**

47.     As described above, it is essential that the Debtors immediately obtain access to sufficient post-petition financing. The preservation of estate assets and the Debtors' ability to operate their business depend heavily upon the expeditious approval of the DIP Credit Agreement and the related actions requested herein.

48.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security. If a debtor-in-possession cannot obtain post-petition credit on an unsecured basis, pursuant to Section 364(c) of the Bankruptcy Code, a court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to super-priority administrative-expense status or is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or a combination of the foregoing. In addition, pursuant to Section 364(d) of the Bankruptcy Code, a court may authorize a debtor to obtain post-petition credit secured by a senior or equal lien on encumbered property (*i.e.*, a "priming" lien) when a debtor is unable to obtain credit elsewhere and the interests of existing lienholders are adequately protected.

49.     The statutory requirement for obtaining post-petition credit under Section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense."  *See In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under Section 364(c)(2) is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under Section 364(c) must prove that it was unable to obtain unsecured credit pursuant to Section 364(b)), *modified on other grounds*, 75 B.R. 553 (Bankr. E.D. Pa. 1987).

50.     Courts have articulated a three-part test to determine whether a debtor may obtain financing under Section 364(c) of the Bankruptcy Code:

(a) the debtor is unable to obtain unsecured credit under Section 364(b) (*i.e.*, by granting a lender administrative-expense priority);

(b) the credit transaction is necessary to preserve the assets of the estate; and

(c) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Aqua Associates*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (applying the above test and holding that "[o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere"); *In re Farmland Industries, Inc.*, 294 B.R. 855, 879-80 (Bankr. W.D. Mo. 2003) (discussing eight factors identified in other cases).  *Cf. In re*

*Ames Department Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (holding that financing will not be approved where "it is apparent that the purpose of the financing is to benefit a creditor rather than the estate" and that the debtor must show that it has made a reasonable effort to seek other sources of financing under Sections 364(a)-(b)).

51.     The Debtors could not have obtained a post-petition financing facility on the terms, and of the type and magnitude required in this case, on an unsecured basis.  To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of Sections 364(c) or 364(d) of the Bankruptcy Code.  *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986).  Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.* at 1088; *see also Ames*, 115 B.R. at 40.  Moreover, where few lenders would likely be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989).

52.     Pursuant to Sections 364(a)-(b) of the Bankruptcy Code, the Debtors are unable to obtain, unsecured credit or unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code.  The terms of the DIP Financing have been negotiated in good faith and at arm's length, and the DIP Financing is being extended in good faith, as that term is used in Section 364(e) of the Bankruptcy Code.

53.     The DIP Financing is necessary to continue, among other things, the orderly operation of the Debtors' business and to maintain business relationships with vendors and

suppliers.   If this Motion is denied or a ruling is delayed, the Debtors' ability to proceed successfully in Chapter 11 could be damaged irreparably.

54.     In the Debtors' business judgment, the DIP Financing is the only financing option available in the circumstances of this case.   The purpose of the DIP Financing is to enable the Debtors to maintain normal business operations during the pendency of this case.   Furthermore, the DIP Financing does not directly or indirectly deprive the Debtors' estate or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases.   *See In re Tenney Village Co.*, 104 B.R. 562, 568-69 (Bankr. D.N.H. 1989) (denying approval of a financing facility that, among other things, did not provide a carve-out for professional fees).   The proposed DIP Financing provides, generally, that the security interests and administrative-expense claims granted to the DIP Lenders are subject to the Carve Out.

55.     As described above, after appropriate investigation and analysis, the Debtors' management has concluded that the DIP Financing is the only alternative available in the circumstances of this case.   Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless a decision is arbitrary and capricious.   *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, receivables facility, and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment on the part of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"); *In re Simasko Production Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Industries, Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same); *In re Curlew Valley Associates*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (holding that courts generally will not second-guess a debtor's business decisions when those

decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code").  In fact, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."  *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

56.     The Debtors have exercised sound business judgment in determining that the DIP Financing is appropriate and has satisfied the legal prerequisites to incur debt under the DIP Credit Agreement.  The terms of the DIP Financing are fair and reasonable and are in the best interests of the Debtors' estates.  Accordingly, the Debtors should be granted authority to enter into the DIP Financing and obtain funds from the DIP Lenders on the secured, administrative "super-priority" basis described above, pursuant to Section 364(c) and (d) of the Bankruptcy Code.

57.     The Lenders will be adequately protected, as required by Section 364(d) of the Bankruptcy Code, if the DIP Financing is approved.  The Lenders have consented to the DIP Financing, including the provision of priming liens to the DIP Lenders, on the terms and conditions set forth in the DIP Credit Agreement and the Interim Order.

**F.     Request for Interim Borrowing Authority**

58.     Pending the final hearing on this Motion, the Debtors require that the DIP Financing be available for, among other things, the orderly continuation and operation of the Debtors' business, so that the Debtors may maintain business relationships with vendors and suppliers and maximize the Debtors' potential for successful operations.

59.     Absent interim relief, the Debtors face the very real risk of substantial disruption in their business operations and damage to vendor and service-provider relationships. Consequently, if interim relief is not obtained, the Debtors' efforts to operate will be immediately and irreparably jeopardized.

60.     Accordingly, the Debtors request that, pending the final hearing on this Motion, the Court consider the Debtors' request for authorization to obtain interim funding under the DIP Financing in accordance with and pursuant to the terms and conditions of the DIP Credit Agreement.

61.     Bankruptcy Rule 4001(c) permits a court to approve a debtor's request for financing during the 14-day period following the filing of a motion requesting authorization to obtain post-petition financing "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Bankruptcy Rule 4001(c)(2). In examining requests for interim relief under this rule, courts apply the same business-judgment standard applicable to other business decisions. *See, e.g., Simasko*, 47 B.R. at 449; *Ames*, 115 B.R. at 38. After the 14-day period, the request for financing is not limited to those amounts necessary to prevent destruction of the debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent in the operation of its business. *See, e.g., Simasko*, 47 B.R. at 449; *Ames*, 115 B.R. at 36.

**G.     Good Faith**

62.     The terms and conditions of the DIP Financing are fair and reasonable and were negotiated by the parties in good faith and at arm's length. Therefore, the DIP Lenders should be accorded the benefits of Section 364(e) of the Bankruptcy Code to the extent that any or all of the provisions of the DIP Financing, or any interim or final order of this Court pertaining thereto,

are hereafter modified, vacated, stayed, or terminated by subsequent order of this or any other court.

## H.   <u>Final Hearing</u>

63.   The Debtors request that the Court schedule the final hearing on this Motion at the earliest possible date in accordance with Bankruptcy Rule 4001(b)-(c), but in no event later than 21 days from entry of the Interim Order.

WHEREFORE, the Debtors respectfully request entry of an Order (i) granting the relief requested herein, and (ii) granting the Debtors such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 26th day of July, 2013.

**BRYAN CAVE LLP**

By: *Keith M. Aurzada*
Keith M. Aurzada
Texas Bar No. 24009880
John C. Leininger
Texas Bar No. 24007544
Jay L. Krystinik
Texas Bar No. 24041279
JP Morgan Chase Tower
Suite 3300
2200 Ross Avenue
Dallas, Texas  75201
Telephone:  (214) 721-8000
Facsimile:  (214) 721-8100

**PROPOSED ATTORNEYS FOR
THE DEBTORS IN POSSESSION**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 26, 2013, a copy of the foregoing was served via United States First Class Mail, Postage Prepaid, to the parties listed below:

Dalton
PO Box 961
Addison, TX 75053

Farnam Street Financial Services, Inc.
240 Pondview Plaza
5850 Opus Parkway
Minnetonka, MN 55343

Broda Enterprise USA Inc
1301 West 400 North Street
Orem, UT 84057

Invacare
P.O. Box 824056
Philadelphia, PA 19182-4056

Drive Medical
PO Box 798019
St. Louis, MO 63179-8000

Life Gas
24963 Network Place
Chicago, IL 60673-1249

Medline
Dept 1080
PO BOX 121080
Dallas, TX 75312-108003-S0125

Air Gas USA, LLC
P.O. Box 7423
Pasadena, CA 91109-7423

J-Meds
P.O. Box 1898
Burleson, TX 76097-1898

Gene Crisman
Advisor to Hospice Source
970 N. 21st St.
Beaumont, TX 77706

Liberty Mutual Insurance
Attn: First Data/Remitco Lockbox
0109 400
White Clay Center Dr.
Newark, DE 19711

Philadelphia Insurance Companies
PO Box 70251
Philadelphia, PA 19176-0251

BeavEx, Inc.
615 Westport Parkway, Ste 600
Grapevine, TX 76051

Montgomery Coscia Greilich LLP
2500 Dallas Parkway, Suite 300
Plano, TX 75093

Sunset Healthcare Solutions
2201 S. Halsted Street, Suite 1344
Chicago, IL 60608

C.H. Robinson Worldwide, Inc.
PO Box 9121
Minneapolis, MN 55480-9121

Respironics
PO Box 405740
Atlanta, GA 30384-5740

Morton Marketing Inc.
48474 Gladstone Rd
Canton, MI 48188

Verizon
PO Box 660108
Dallas, TX 75266-0108

CPI Office Products
P.O. Box 292130
Lewisville, TX 75029-2130

Westbury Investment Partners
SBIC, LP
100 Motor Parkway, Suite 165
Hauppauge, NY 11788

Westbury SBIC, Inc.
100 Motor Parkway, Suite 165
Hauppauge, NY 11788

Texas Capital Bank
Attn: Elizabeth Mitchell
2000 McKinney Avenue, Suite 700
Dallas, TX 75201

Texas Capital Bank –
Equipment Lease
Attn: Sheila Barge
5800 Granite Pkwy, Suite 150
Plano, TX 75024

United States Attorney's Office
110 North College Avenue, Suite 700
Tyler, TX 75702-0204

United States Trustee's Office
110 North College Avenue, Suite 300
Tyler, TX 75702-7231

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

Key Equipment Finance
11030 Circle Point Dr., Suite 200
Westminster, CO 80020

Medline Industries, Inc.
c/o Michael S. Baim
The CKB Firm
30 North LaSalle St., Suite 1520
Chicago, IL 60602

EFTM, Inc. d/b/a
Parwest Staffing Services, Inc.
c/o Kimberly R. Stuart
Crain Caton & James, PC
1401 McKinney Street, 17th Floor
Houston, TX 77010-4035

Compudata Products, Inc., d/b/a CPI
One Point
SCHEEF & STONE, L.L.P.
2601 Network Boulevard, Suite 102
Frisco, Texas 75034

The undersigned further certifies that on July 26, 2013, a copy of the foregoing was served via electronic mail to the parties listed below:

Counsel for Texas Capital Bank:
Mark X. Mullin, Mark.Mullin@haynesboone.com

Counsel for Westbury SBIC, Inc. and Westbury Investment Partners SBIC, LP
Patrick Collins, pcollins@farrellfritz.com
Stephen F. Melore, smelore@farrellfritz.com

Counsel for Crothers Management, Inc.
Jack E. Jacobsen, jjacobsen@lockelord.com
Jeff Baker, jeff@bakerlawpllc.com

Counsel for Invacare Credit Corporation
James Billingsley, jbillingsley@polsinelli.com

Office of the United States Trustee
c/o Marc Salitore, marc.f.salitore@usdoj.gov


                                         */s/ Jay L. Krystinik*
                                        Jay L. Krystinik