IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| MED-DEPOT, INC. D/B/A HOSPICE | § | |
| SOURCE, *ET AL.*, | § | Jointly Administered Under |
| | § | Case No. 13-41815 |
| | § | |
| Debtors. | § | |

**<u>AMENDED DISCLOSURE STATEMENT FOR JOINT PLAN OF REORGANIZATION</u>**

Keith M. Aurzada
John C. Leininger
Jay L. Krystinik
Bryan Cave LLP
2200 Ross Ave., Suite 3300
Dallas, Texas 75201

Attorneys for Debtors-in-Possession

[The balance of this page is intentionally left blank.]

Med-Depot Holdings, LLC and Med-Depot, Inc. d/b/a Hospice Source (the "Debtors") submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to Holders of Claims in connection with the solicitation of acceptances of the Debtors' Joint Plan of Reorganization, dated July 26, 2013 (the "Plan").  A copy of the Plan is attached hereto as Exhibit A.

## INTRODUCTORY DISCLOSURES

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") IN SUPPORT OF THE PLAN, FILED BY THE DEBTORS, SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, INCLUDING PROVISIONS RELATING TO THE PLAN'S TREATMENT OF CLAIMS AGAINST THE DEBTORS. THE DISCLOSURE STATEMENT ALSO SUMMARIZES CERTAIN FINANCIAL INFORMATION CONCERNING THE DEBTORS AND THE CLAIMS ASSERTED AGAINST THE DEBTORS IN THE BANKRUPTCY CASE. WHILE THE DEBTORS BELIEVE THAT THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION WITH RESPECT TO THE INFORMATION SUMMARIZED, CREDITORS SHOULD REVIEW THE ENTIRE PLAN AND EACH OF THE DOCUMENTS REFERENCED HEREIN, AND SHOULD SEEK THE ADVICE OF THEIR OWN COUNSEL BEFORE CASTING THEIR BALLOTS.

EXCEPT FOR THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND ITS EXHIBITS, NO REPRESENTATIONS CONCERNING THE DEBTORS, THE DEBTORS' ASSETS AND LIABILITIES, THE PAST OR FUTURE OPERATION OF THE DEBTORS, THE PLAN, OR ALTERNATIVES TO THE PLAN ARE AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN. ANY REPRESENTATIONS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN, OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND ITS EXHIBITS, ARE UNAUTHORIZED AND SHOULD BE REPORTED TO THE DEBTORS.

THE APPROVAL OF THE DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTY OF THE ACCURACY AND COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.  NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT, EXPRESS OR IMPLIED, IS

INTENDED TO GIVE RISE TO ANY COMMITMENT OR OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED AS CONFERRING UPON ANY PERSON ANY RIGHTS, BENEFITS OR REMEDIES OF ANY NATURE WHATSOEVER. THE DISCLOSURE STATEMENT IS INFORMATIONAL ONLY. ADDITIONALLY, CREDITORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH CREDITOR SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY MATTER CONCERNING THE PLAN, INCLUDING THE TREATMENT OF CLAIMS UNDER THE PLAN, THE RELEASES PROVIDED BY AND PROPOSED UNDER THE PLAN, THE TRANSACTIONS AND INJUNCTIONS PROVIDED UNDER THE PLAN, AND THE VOTING PROCEDURES AND ELECTIONS APPLICABLE TO THE PLAN.

## ARTICLE 1
## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

This Disclosure Statement provides information regarding the chapter 11 plan of reorganization that the Debtors are seeking to have confirmed by the Bankruptcy Court. The Debtors believe that the Plan is in the best interests of all creditors. The Debtors urge all Holders of Claims entitled to vote on the Plan to vote in favor of the Plan.

All capitalized terms used but not defined herein shall have the meanings provided to them in the Plan. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between the summary herein and the Plan, the Plan shall govern. Unless the context requires otherwise, the words "we," "our," and "us" refer to the Debtors.

The Confirmation of the Plan and effectiveness of the Plan are subject to certain material conditions precedent described herein. There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied will be satisfied or waived.

You are encouraged to read this Disclosure Statement in its entirety, including without limitation, the Plan, which is annexed as Exhibit A hereto, and the section entitled "Risk Factors," before submitting your ballot to vote on the Plan.

The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or an endorsement of the merits of the Plan by the Bankruptcy Court.

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, the exhibits and schedules attached to the Plan and this Disclosure Statement and the Plan Supplement. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date.     Except     as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and confirmation of, the Plan and may not be relied on for any other purpose. The Debtors believe that the summary of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement is fair and accurate. The summaries of the financial information and the documents annexed to this Disclosure Statement, including, but not limited to, the Plan, or otherwise incorporated herein by reference, are qualified in their entirety by reference to those documents.

No representations concerning the Debtors or the value of the Debtors' property have been authorized by the Debtors other than as set forth in this Disclosure Statement. Any information, representations or inducements made to obtain acceptance of the Plan, which are other than or inconsistent with the information contained in this Disclosure Statement and in the Plan, should not be relied on by any Claim Holder entitled to vote on the Plan.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC") or any similar federal, state, local or foreign regulatory agency, nor has the SEC or any other such agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been and will not be audited or reviewed by the Debtors' independent auditors unless explicitly stated otherwise herein.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws. The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:  any future effects as a result of the pendency of the Chapter 11 Cases; the Debtors' expected future financial position, liquidity, results of operations, profitability and cash flows; projected dividends; financing plans; competitive position; business strategy; budgets;  projected cost reductions; projected and estimated liability costs; results of litigation;   disruption of operations; plans and objectives of management for future operations;  contractual obligations; growth opportunities for existing services; projected price increases; and projected general market conditions.

Statements concerning these and other matters are not guarantees of the Debtors' future performance. Such statements represent the Debtors' estimates and assumptions only as of the date such statements were made. There are risks, uncertainties and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project and the Debtors undertake no obligation to update any such statement. These risks, uncertainties and factors include:  the Debtors' ability to develop, confirm and consummate the Plan; the Debtors' ability to reduce their overall financial leverage; the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management and employees, and the risks associated with operating businesses in the Chapter 11 Cases; the applicable Debtor's ability to comply with the terms of the DIP Facility; customer response to the Chapter 11 Cases; general economic, business and market conditions, including the recent volatility and disruption in the capital and credit markets and the significant downturn in the overall economy; exposure to litigation; dependence upon key personnel; financial conditions of the Debtors' customers; limited access to capital resources; changes in laws and regulations; and inability to implement business plan.

## ARTICLE 2
## GENERAL INFORMATION ABOUT CHAPTER 11

**A.**    **What is Chapter 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 of the Bankruptcy Code promotes equality of treatment for similarly situated creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the bankruptcy commencement date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the Debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court, in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's debt in accordance with the terms of the confirmed plan.

**B.**    **Why Did I Receive This Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a Disclosure Statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan. This Disclosure Statement is being submitted in accordance with such requirements.

**C.**    **Am I Entitled to Vote On the Plan?**

Your ability to vote and your distribution under the Plan, if any, depend on what kind of Claim or Interest you hold. A summary of the Classes of Claims and Interests (each, a category of Holders of Claims or Interests and their respective voting statuses is set forth in Article 6 of this Disclosure Statement and Article 3 of the Plan pursuant to section 1122(a).

You should refer to this entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Allowed Claims against and Interests in each of the Debtors.

**D.      What are the Contents of the Solicitation Packages?**

All parties in interest will receive:  (i) a copy of the Disclosure Statement and all related exhibits, including the Plan; (ii) the Order Approving the Disclosure Statement; (iii) the notice of the Confirmation Hearing; and (iv) an appropriate ballot.

The notices sent to parties in interest will indicate that this Disclosure Statement, the Plan and all of the exhibits thereto are available upon written request to John C. Leininger, Bryan Cave LLP, 2200 Ross Ave., Suite 3300, Dallas, Texas 75201, [john.leininger@bryancave.com](mailto:john.leininger@bryancave.com).

**E.      What is the Deadline to Vote on the Plan?**

The Deadline to submit ballots accepting or rejecting the Plan is October 16, 2013.

**F.      How Do Cast My Ballot on the Plan?**

This Disclosure Statement, accompanied by a ballot to be used for voting on the Plan, is being distributed to the Holders of Claims entitled to vote on the Plan. If you are a Holder of Claim that is entitled to vote, you may vote for or against the Plan by completing the ballot and returning it in the envelope provided to the Balloting Agent as follows:

John C. Leininger
Bryan Cave LLP
2200 Ross Ave., Suite 3300
Dallas, Texas 75201
[John.Leininger@bryancave.com](mailto:John.Leininger@bryancave.com)
Facsimile:  (214) 220-6740

Any ballot that is properly executed by the Holder of a Claim, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, shall not be counted.

Each Holder of a Claim may cast only one ballot per each Claim held. By signing and returning a ballot, each Holder of a Claim will certify to the Bankruptcy Court and the Debtors that no other ballots with respect to such Claim and/or Equity Interest have been cast or, if any other ballots have been cast with respect to such Class of Claims, such earlier ballots are thereby superseded and revoked.

**G.**     **Why is The Bankruptcy Court Holding a the Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under the plan of reorganization, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of the plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**H.**     **When is the Confirmation Hearing?**

The Bankruptcy Court has scheduled the Confirmation Hearing for October 21, 2013 to take place at 3:00 p.m. (CST) before the Honorable Brenda T. Rhoades, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Eastern District of Texas, located at Suite 300B, 660 North Central Expressway, Plano, Texas 75074. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than October 14, 2013 to take place at 5:00 p.m. (CST) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement. Unless objections to Confirmation of the Plan are timely served and filed in compliance with the Disclosure Statement Order, which is attached to this Disclosure Statement as Exhibit B, they may not be considered by the Bankruptcy Court.

**I.**     **What is the Impact of the Plan on the Debtors' Business?**

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code. As a result, the Confirmation of the Plan means that the Debtors will not be liquidated or forced to go out of business. The Debtors will continue to operate their business going forward using cash from operations additional post-Effective Date lending and post-Effective Date equity investments.

# ARTICLE 3
## THE DEBTORS' CORPORATE HISTORY, STRUCTURE AND BUSINESS OVERVIEW

**A.      Corporate History**

The Debtors' corporate history dates back to 1998 when Ken Baker, Norm Foster and James Griffin (the "Founders") founded Hospice Source in Oklahoma.  The Founders recognized a need in the hospice industry for a company that focused on meeting the special equipment needs and challenges of hospice providers.  Hospice Source was created to be a company that could (i) react to customer needs more quickly than the typical large home medical equipment companies and (ii) offer more flexibility to customers than the smaller "mom and pop" type companies that were in existence in the market.

In 2006, Hospice Source was acquired by Med-Depot Holdings, Inc. and was renamed Med-Depot, Inc. d/b/a Hospice Source.  In 2007, the Debtors expanded their business to Midwest United states by acquiring the assets of Medical One, Inc., a Missouri based provider of home medical equipment to eighteen (18) hospice providers and long term care facilities.  Over time, the Debtors continued to grow their business by making strategic acquisitions of smaller and larger competitors with a primary goal of growing the number of patients served.  During 2010, the Debtors acquired four (4) competitors and increased its patient count by 850.

**B.      Business Overview**

The Debtors are full service national providers of respiratory therapy and home medical equipment to hospice providers and their patients.  The Debtors' business consists of home medical equipment rental, delivery, pickup and service.  The bulk of the home medical equipment rented includes:  hospital beds, oxygen concentrators, nebulizers, suction machines, specialty mattresses, wheelchairs and related items.  The Debtors have locations in Texas, Louisiana, Kansas, Indiana, Missouri, Oklahoma, and California.

The Debtors developed a proprietary, web-based customer ordering, logistics and billing system that gives their customers access to patient and equipment data.  Using the Debtors' software, customers can place new orders, look-up patient information, track the delivery and pick-up of equipment and run utilization reports.  Overall, the Debtors' software allows for greater efficiency in the processing of customer orders, which in turn results in the Debtors being able to deliver equipment with fewer errors and at lower cost.  In addition to the software, the Debtors operate an after hour call center to address urgent customer needs.

Historically, the Debtors have acquired their inventory of home medical equipment through capital leases, with the primary supplier being Invacare.

The Debtors' sales and marketing efforts also differentiate them from their competitors. Instead of contracting directly with patients, as most of their competitors do, the Debtors market to hospice providers and provide equipment to the hospice provider's patients.  The Debtors also participate in several hospice industry trade shows.  The Debtors marketing efforts have allowed them to build a nationally recognizable brand name and grow its patient base.

C.      **The Hospice Industry**

Hospice is one of the fastest growing areas of U.S. healthcare, which is expected to account for $20 billion in revenue by 2015.  Hospice programs provide state-of-the-art palliative care and supportive services to individuals at the end of their lives, and their family members 24 hours a day, seven days a week in both home and facility based care settings.  Hospice provides a very cost-effective alternative to in-patient care.  Over the last decade, there has been a growth of hospice election by patients in recognition that hospice can appropriately care for patients.

D.      **Debtors' Prepetition Debt Structure**

As of the Petition Date, the Debtors' total consolidated debt was approximately $18,500,000.  The debt obligations arose under the:  (a) Amended and Restated Revolving Promissory Note (the "TCB Revolving Note"), dated as of May 26, 2011 executed by the Debtors as borrowers payable to the order of TCB as lender, in the original principal amount of $1,500,000; (b) Term Promissory Note (the "TCB Term Note"), dated as of May 26, 2011 executed by the Debtors as borrowers payable to the order of TCB as lender, in the original principal amount of $3,000,000; (c) Secured Term Loan Note (the "Westbury Note"), dated as of May 26, 2011, in the stated principal sum of 12,500,000, by and between Med-Depot and Westbury; and (d) Lease Agreement (the "Invacare Agreement") dated as of March 20, 2012, by and between Med-Depot and Invacare.

The debt owed under the TCB Revolving Note and the TCB Term Note are secured by that certain Amended and Restated Security Agreement dated as of May 26, 2011, by and between Med-Depot as grantor and TCB as secured party, and that certain Amended and Restated Security Agreement dated as of May 26, 2011, by and between Holdings as grantor and TCB as secured party.  The debt owed under the Westbury Note is secured by that certain Amended and Restated Security Agreement dated as of May 26, 2011, by and among the Med-Depot and Westbury.  Holdings is a guarantor of Med-Depot's obligations under the Westbury Note and that guaranty is secured by that certain Amended and Restated Security Agreement dated as of May 26, 2011, by and between Holdings and Westbury.  As further security for its obligations as guarantor of the Westbury Note, Holdings pledged its interest in the stock of Med-Depot to Westbury pursuant to that certain Stock Pledge Agreement dated as of May 26, 2011. The Debtors as borrowers, TCB as senior lender and Westbury as junior lender are also parties that certain Intercreditor Agreement dated as of May 26, 2011.  Pursuant to the Intercreditor Agreement, Westbury voluntarily subordinated its interest in the Debtors' property to the claims of TCB.

The Invacare Agreement, although styled as a lease, contains an end-of-lease purchase option of $1.  Thus the Debtors are treating the Invacare Agreement as a disguised financing rather than a true lease.  The Invacare Agreement grants Invacare a first priority security interest in all home medical equipment supplied by Invacare to the Debtors.  Public records indicate a termination statement and a continuation statement regarding Invacare's interest were recently filed.  The Debtors continue to investigate Invacare's secured status, and reserve all rights related thereto.

# ARTICLE 4
## EVENTS LEADING TO CHAPTER 11 FILINGS

A number of factors contributed to the Debtors' decision to commence the Chapter 11 Cases. Although the Debtors' business is operationally sound, the Debtors' has experienced difficulty meeting its debt service obligations while at the same time meeting operating costs.

### A.       Growth and Reaching Credit Limit

In the recent past, the Debtors have grown their businesses by acquiring smaller and larger competitors. The expansion of business has been accompanied by an increased need for home medical equipment and cash flow to fund operations and debt service. As a result of the increased needs for available cash, the Debtors quickly reached their borrowing limits under the various borrowing agreements to which they are parties.

### B.       Legal Proceedings Outside of Bankruptcy Court

(i)  Farnam Street Litigation:  In early 2012, a dispute between Med-Depot and one of its home medical equipment vendors, Farnam Street Financial Inc., resulted in litigation in the United States District Court for the District of Minnesota, Minneapolis Division. Farnham was awarded a judgment against the Debtors in the amount of $450,000. Subsequently, the Debtors and Farnam negotiated a settlement of the judgment under which the judgment amount was reduced to $300,000 and Med-Depot agreed to make regular payments to Farnam to satisfy the judgment.

(ii)  Parwest Staffing Services, Inc. Litigation:  On April 25, 2013, EFTM, Inc. d/b/a Parwest Staffing Services, Inc. filed suit against Med-Depot in County Court at Law No. 4, Harris County, Texas, alleging claims for breach of contract and suit on a sworn account. Med-Depot filed a general denial to the allegations in the petition.

(iii)  Key Equipment Finance Demand Letter:  On May 22, 2013, Med-Depot received a demand letter from Key Equipment Finance, Inc.  The letter threatens the commencement of litigation for non-payment of a note secured by durable medical equipment located in Oklahoma City, Oklahoma.  To the Debtors' knowledge, no litigation has been commenced related to this demand letter.

(iv)  Medline Industries, Inc., et al. Litigaiton:  On June 26, 2013, the Debtors were sued by Medline Industries, Inc., *et al.* in Cook County Illinois.  The Plaintiffs have asserted damages of $106,491.88.  This matter has not gone to trial.

### C.       Attempts to Restructure Outside of Bankruptcy

Prior to filing the Chapter 11 Cases, the Debtors worked with TCB, Westbury, Invacare and the Founders in an attempt to restructure the Debtors' obligations outside of bankruptcy. While the Debtors were able to reach agreements with TCB, Westbury, and Invacare, they were unable to reach an agreement with Ken Baker.  The Debtors' inability to reach a global resolution with all of its constituents outside of bankruptcy lead directly to the filing of the Chapter 11 Cases.

**D.**     **Prepetition Negotiation of Plan of Reorganization**

After negotiations for an out of court restructuring broke down, the Debtors began negotiating the terms of a Chapter 11 plan with TCB, Westbury, Evolve and Invacare.  As a result of these negotiations, the Debtors drafted the Plan and this Disclosure Statement.

**ARTICLE 5**
**THE CHAPTER 11 CASES TO DATE**

On July 26, 2013, the Debtors filed voluntary petitions in the United States Bankruptcy Court for the Eastern District of Texas seeking relief under the provisions of chapter 11 of the Bankruptcy Code to effectuate a restructuring of the Debtors' obligations.

The Debtors have requested joint administration of their cases under the name of Med-Depot.  The Debtors continue to operating their businesses and manage their properties as debtors in possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

**A.**     **First Day Relief**

The Debtors entered into bankruptcy after a careful review of their business operations and cash requirements to minimize the impact of the Chapter 11 Cases on their day-to-day business operations. Integral to this transition were certain "first day" orders the Debtors sought from the Bankruptcy Court to provide, among other things, (a) authority to use cash collateral; (b) authority to incur debtor-in-possession financing; (c) authority to continue using the same cash management system; and (d) an order prohibiting the Debtors' utility suppliers from discontinuing service.

**B.**     **Debtor-in-Possession Financing**

On the Petition Date, the Debtors filed a motion seeking approval of up to $550,000 in debtor in possession financing (the "DIP Facility"), which consists of an approximate $50,000 loan of new money from TCB, a $250,000 loan of new money from Westbury, and a $250,000 loan of new money from Evolve. The DIP Facility is secured by (i) a lien on the collateral securing the TCB Revolving Note and the TCB Term Note that is *pari passu* with TCB's prepetition lien; (ii) a first priority lien on all property of the Debtor that is not otherwise encumbered; and (iii) a second lien on property of the Debtor in which third parties hold a valid prepetition security interest, if any.  The DIP Facility is necessary for the Debtors to meet operating and administrative expense needs during the Bankruptcy Cases.

**C.**     **Retention of Restructuring Professionals**

To assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases, the Debtors sought Bankruptcy Court approval of the retention of Bryan Cave LLP as their restructuring attorneys.

**D.      Rejection of Certain Burdensome Leases**

The Debtors may file one or more motions seeking to reject certain prepetition unexpired leases that are burdensome to the Debtors.

**ARTICLE 6**
**DESCRIPTION OF THE PLAN**

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

The Plan itself and the documents therein control the actual treatment of Claims against and Interests in the Debtors under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Interests in the Debtors, the Debtors' Estates, the Reorganized Debtor, all parties receiving property under the Plan, and other parties in interest. In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.

**A.      Administrative Claims and Priority Claims**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, Other Priority Claims and Intercompany Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article II of the Plan.

**1.      General Administrative Claims**

Except with respect to Administrative Claims that are Fee Claims and except to the extent that a Holder of an Allowed Administrative Claim and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of an Allowed Administrative Claim shall be paid in full in Cash on the later of: (i) on or as soon as reasonably practicable after the Effective Date, (ii) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed, and (iii) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that Allowed Administrative Claims that arise in the ordinary course of the Debtors' business shall be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order, including, without limitation, all

Claims by the Prepetition Agents pursuant to the Interim DIP Orders and all Claims Allowed under this Plan.

**2.      Professional Compensation**

(a) Fee Claims

Professionals or other Entities asserting a Fee Claim for services rendered before the Confirmation Date must File and serve on the Debtors and such other Entities who are designated by the Bankruptcy Rules, or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than thirty (30) days after the Effective Date; provided that the Reorganized Debtor may pay retained Professionals or other Entities in the ordinary course of business after the Confirmation Date without further Bankruptcy Court order. Objections to any Fee Claim must be Filed and served on the Reorganized Debtor and the requesting party no later than the earlier of twenty-four (24) days after the filing or sixty (60) days after the Effective Date.

(b) Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtor shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses incurred by the Reorganized Debtor. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor may employ and pay any Professional for services rendered or expenses incurred after the Confirmation Date in the ordinary course of business without any further notice to any party or action, order, or approval of the Bankruptcy Court.

**3.      Administrative Claim Bar Date**

Except as otherwise provided in this Article II.A, requests for payment of Administrative Claims must be filed and served on the Reorganized Debtor no later than thirty (30) days after the Effective Date. Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be filed and served on the Reorganized Debtor and the requesting party no later than the earlier of twenty-four (24) days after the filing or sixty (60) days after the Effective Date.

**4.      Priority Tax Claims**

Each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, on the Distribution Date, at the option of the Debtors, one of the following treatments: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (2) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in

installment payments over a period of time not to exceed five years after the Effective Date; or (3) such other treatment as may be agreed upon by such Holder and the Debtors or otherwise determined upon an order of the Bankruptcy Court.

### 5.    Other Priority Claims

Each Holder of an Allowed Other Priority Claim due and payable on or before the Effective Date shall receive, on the Distribution Date, at the option of the Debtors, one of the following treatments: (1) Cash in an amount equal to the amount of such Allowed Other Priority Claim; (2) Cash in an aggregate amount of such Allowed Other Priority Claim payable in installment payments over a period of time not to exceed five years after the Effective Date; or (3) such other treatment as may be agreed upon by such Holder and the Debtors or otherwise determined upon an order of the Bankruptcy Court.

### 6.    Statutory Fees

On the Distribution Date, the Reorganized Debtor shall pay, in full in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation. On and after the Confirmation Date, the Reorganized Debtor shall pay the applicable U.S. Trustee fees until the entry of a final decree in each Debtors' Chapter 11 Case or until such Chapter 11 Case is converted or dismissed.

## B.    Classification and Treatment of Claims and Interests

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in each of the Debtors. A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and receiving distributions pursuant to the Plan only to the extent that such Claim or Interest has not been paid, released, withdrawn or otherwise settled before the Effective Date.

### 1.    Summary of Classification

The following table classifies Claims against and Equity Interests in each Debtor collectively, for all purposes, including voting, confirmation and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that such Claim or Equity Interest or any portion thereof qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.  Each Class set forth below is treated hereunder as a distinct Class for voting and distribution purposes.

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
|  |  |  |  |

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | TCB Secured Claim | Impaired | Entitled to Vote |
| 2 | Westbury Secured Claim | Impaired | Entitled to Vote |
| 3 | Invacare Claim | Impaired | Entitled to Vote |
| 4 | Other Secured Claims | Impaired | Entitled to Vote |
| 5 | Junior Subordinated Debt | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | No Distribution | Deemed to Reject |
| 8 | Equity Interests | No Distribution | Deemed to Reject |

**2.      Treatment of Claims and Interests**

To the extent Class of Claims contains Allowed Claims or Allowed Interests with respect to the Debtors, the treatment provided to each Class for distribution purposes is specified below:

**Class 1- TCB Secured Claim**

a)      Classification:  Class 1 consists of the TCB Revolving Debt and the TCB Revolving Debt.

b)      Allowance:  The Claim in Class 1 shall be Allowed and deemed to be Allowed in an amount to be determined prior to the Effective Date (expected to be approximately $4,000,000) (the "***TCB Allowed Class 1 Claim***").

c)      As of the Effective Date, to refinance the TCB Term Debt and the TCB Revolving Debt, the Debtors shall execute and deliver to TCB that certain Second Amended and Restated Credit Agreement, dated as of the Effective Date, by and among Debtors and TCB, which agreement shall be in amendment, restatement, renewal, extension, and increase of the TCB Revolving Debt and the TCB Term Debt (the "***Amended and Restated TCB Facility***").  The Amended and Restated TCB Facility shall include, without limitation, (i) a term loan in the full amount of the TCB Term Debt

outstanding as of the Effective Date plus an additional amount of $500,000, such term loan to be evidenced by that certain Amended and Restated Term Promissory Note, executed by Debtors, payable to TCB in the original principal amount of the aggregate amount of the TCB Revolving Debt and the TCB Term Debt (the "Amended and Restated TCB Term Note") and (ii) a revolving line of credit in a principal amount outstanding at any given time not to exceed $1,500,000 or such lesser amounts as further detailed in the documents evidencing the Amended and Restated TCB Facility, such revolving line of credit to be evidenced by that certain Second Amended and Restated Revolving Promissory Note, executed by Debtors, payable to TCB in the amount of such revolving line of credit (the "Amended and Restated TCB Revolver Note").

d)      Cash Payment on Effective Date.  The Debtors shall make a cash payment to TCB on the Effective Date in the amount of $217,280.21 representing a repayment of the amount of overdrafts funded under the TCB Revolving Debt as of the Petition Date.

e)      Repayment of the Amended and Restated TCB Facility:  In full and final satisfaction, discharge, and release of the Amended and Restated TCB Facility, the Reorganized Debtor shall pay the Amended and Restated TCB Facility as follows:

(1)     Interest.  Interest shall accrue on the Amended and Restated TCB Facility on and after the Effective Date at a fluctuating rate of interest as set forth in each of the Amended and Restated TCB Revolver Note and the Amended and Restated TCB Term Note, but in no event less than [five and one half percent (5.50%)] per annum.

(2)     Amortization.  The obligations with respect to the Amended and Restated TCB Term Note shall be amortized over four (4) years.

(3)     Final Stated Maturity.   The final stated maturity date of the Amended and Restated TCB Term Note and the Amended and Restated TCB Revolver Note shall be as set forth in the documentation evidencing the Amended and Restated TCB Facility.

(4)     Payments.  Payments of principal and interest with respect to the obligations of the Debtors under the Amended and Restated TCB Term Note and payments of interest with respect to the obligations of Debtors under the Amended and Restated TCB Revolver Note shall commence on the first day of the first month following the Effective Date and shall continue monthly thereafter.  The first payments shall be adjusted to include all interest accruing since the Effective Date.

(5)     Retention of Lien.  On the Effective Date, and without the need for further order, document, or action, all liens, interests and encumbrances provided for under the TCB Security Agreements

shall be ratified and validated, and shall survive the confirmation of the Plan and shall represent first priority, valid, and perfected liens, interests, and encumbrances against the property of the Reorganized Debtor without any further action by any party. Any new lien or security interest documents executed by the Reorganized Debtor under the Plan on account of the Amended and Restated TCB Facility shall related back for all purposes to the date of the original recording and filing of the TCB Security Agreements. TCB may, but is not required to, file or record this Plan and the Confirmation Order with any applicable governmental entity as conclusive proof and notice to the world of the ratification and validation of the existence, validity, extent and priority of its liens and security interests as of the Effective Date, securing the Amended and Restated TCB Facility.

(6)   Default and Cure. In the event the Reorganized Debtor fails to comply with any payment obligation to TCB under this Class 1 of the Plan and/or the Amended and Restated TCB Facility, TCB may transmit notice of such failure to the Reorganized Debtor by transmitting the same, by overnight mail, or any other nationally recognized overnight courier, to the Reorganized Debtor Notice Person and the Committee Notice Person. In the event the Reorganized Debtor does not cure such default within ten (10) Business Days of transmittal of such notice, the Reorganized Debtor shall be in default of their obligations under the Plan and the Amended and Restated TCB Facility and TCB may exercise any and all rights, claims, liens, and interests against the Reorganized Debtor and its property.

(7)   Prepayment. Notwithstanding anything contained to the contrary in the documents evidencing the Amended and Restated TCB Facility, Reorganized Debtor may prepay the Amended and Restated TCB Facility in part or in full at any time without penalty.

(8)   Release of Liens. Promptly upon payment of all obligations to TCB under the Amended and Restated TCB Facility and the termination of any commitments of TCB to advance funds thereunder, TCB shall execute and shall record, or shall permit to be recorded, one or more release of lien and security interest documents releasing and discharging all of its liens, claims, interests, and encumbrances securing the Amended and Restated TCB Facility.

f)   Release of TCB by Debtors. Each of the Debtors hereby acknowledges that the TCB Allowed Class 1 Claims are absolute and unconditional without any right of recission, setoff, counterclaim, defense, offset, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any part of its

liability to repay the TCB Allowed Class 1 Claims or to seek affirmative relief or damages of any kind or nature from TCB.  The Debtors and their Estates hereby voluntarily and knowingly release and forever discharge TCB, and each of its predecessors, agents, employees, successors, officers, directors, principals, employees, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other Professionals (collectively, the "*TCB Released Parties*"), from any and all possible claims, demands, actions, causes of action, damages, costs, expenses, and liabilities whatsoever, known or unknown, anticipated or unanticipated, suspected or unsuspected, fixed, contingent, or conditional, at law or in equity, originating in whole or in part on or before the effective date, which the debtors may now or hereafter have against the TCB Released Parties, if any, and irrespective of whether any such claims arise out of contract, tort, violation of law or regulations, or otherwise, and arising from any obligations under or in respect of the TCB Allowed Class 1 Claims, including, without limitation, any contracting for, charging, taking, reserving, collecting, or receiving interest in excess of the highest lawful rate applicable, and/or the exercise of any rights or remedies under any document evidencing any of the TCB Allowed Class 1 Claims.

g)      Impairment.  Class 1 is Impaired and, therefore, is entitled to vote to accept or reject the Plan.

Class 2 - Westbury Secured Claim.

(a)      Classification:  Class 2 consists of Westbury's secured claim for the amounts owed by the Debtors to Westbury under the Westbury Note and the Westbury Credit Agreement.

(b)      Treatment:  In full satisfaction of its Allowed Class 2 Claim, Westbury shall receive the Preferred B Stock.  The Preferred B Stock shall be issued to Westbury free and clear of all liens, claims and encumbrancdes.

(c)      Impairment.  Class 2 is Impaired and, therefore, is entitled to voted to accept or reject the Plan.

Class 3 – Invacare Secured Claim

(a)      Classification:  Class 3 consists of the Invacare Claim.

(b)      Treatment:  In the event that Invacare casts a vote in favor of the Plan and agrees to extend post-confirmation credit to Reorganized Med-Depot its Allowed Class 3 Claim shall be amortized over four (4) years at eight percent (8%) interest.  In exchange for the foregoing, the Debtors will release any causes of action they have against Invacare under chapter 5 of the Bankruptcy Code and applicable state law.

In the event that Invacare elects to vote against the Plan and/or refuses to extend post-confirmation credit to Reorganized Med-Depot, its Allowed Class 3 Claim shall be amortized over four (4) years at five percent (5%).  Further, the Reorganized Debtor will

litigate all causes of action the Debtors' estates have against Invacare under Chapter 5 of the Bankruptcy Code and applicable state law.

Retention of Liens:  On the Effective Date, all liens, interests and encumbrances provided for under the Invacare Agreement, to the extent Allowed by a Final Order, shall be ratified and validated, and shall survive the confirmation of the Plan and shall attach to the Reorganized Debtor's property to the same extent and priority as such liens held before the Petition Date.

Class 4 – Other Secured Claims

      (a)     Classification:  Class 4 Consists of all other Allowed Secured Claims.

      (b)     Treatment:  Each Allowed Other Secured Claim against the Debtors shall be reinstated, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the Holder of an Allowed Other Secured Claim to demand or receive payment of such claim prior to the state maturity of such claim from and after the occurrence of an event of default.  The maturity date for all Allowed Other Secured Claims shall be extended by five (5) months.

      (c)     Retention of Liens:  Holders of Allowed Other Secured Claims shall retain any and all validly attached and properly perfected liens that they possessed on the Petition Date.

      (d)     Voting: Allowed Class 4 Claims are Impaired and, therefore the Holders of Allowed Class 4 Claims are entitled to vote to accept or reject the Plan.

Class 5 - Junior Subordinated Debt

      a)     Classification.  Class 5 consists of all Junior Subordinated Debt Claims.

      b)     Treatment.  In full satisfaction, settlement and discharge of the Allowed Junior Subordinated Debt Claims, the holders of each Allowed Junior Subordinated Debt Claim shall receive a pro-rata share of the Preferred C Stock.  The Preferred C Stock shall be issued to the holders of Allowed Junior Subordinated Debt Claims free and clear of all liens, claims and encumbrances.

      c)     Impairment.  Class 5 is Impaired and, therefore is entitled to vote to accept or reject the Plan.

Class 6 – General Unsecured Claims

      a)     Classification.  Class 6 consists of all General Unsecured Claims.

      b)     Treatment.  In full satisfaction, settlement and discharge of the Allowed General Unsecured Claims, the holder of each Allowed General Unsecured Claim shall receive its pro-rata share of $200,000 on the Distribution Date, its pro-rata share of

$100,000 on the first anniversary of the Distribution Date and its pro-rata share of $100,000 on the second anniversary of the Distribution Date.

c)       Impairment.  Class 6 is Impaired and, therefore is entitled to vote to accept or reject the Plan.

Class 7 – Intercompany Claims

a)       Classification.  Class 7 consists of all Intercompany Claims.

b)       Treatment.  All Intercompany Claims shall be cancelled and the Holders of Intercompany Claims shall receive no property or Distribution under the Plan.

c)       Impairment.  Class 7 will receive nothing under the Plan and therefore are deemed to reject the Plan.

Class 8 – Equity Interests

a)       Classification.  Class 8 consists of Equity Interests in all of the Debtors.

b)       Treatment.  All Equity Interests shall be canceled and holders of Equity Interest shall receive no property or Distribution under the Plan.

c)       Impairment.  Class 8 will receive nothing under the Plan and therefore are deemed to reject the Plan.

**3.       Acceptance Requirements**

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an impaired class of claims has accepted the applicable Plan if the Holders of at least two thirds in dollar amount and more than one-half in number of Allowed Claims in such Class actually voting have voted to accept the applicable Plan.

**A.       Acceptance or Rejection of the Plan**

(i) Voting Class

Classes 1, 2, 3, 4, 5 and 6 are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

(ii) Deemed Rejection of the Plan

Classes 7 and 8 are Impaired and shall receive no distribution under the Plan and are, therefore, deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

**B.       Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

### 4.      Means for Implementation of the Plan

### A.      Substantive Consolidation

The estates of the Debtors will be substantively consolidated.

### B.      Conversion of DIP Facility Evidenced by the CMI DIP Credit Agreement and the Westbury DIP Credit Agreement to New Equity

On the Effective Date the obligations evidenced by the CMI DIP Credit Agreement and the Westbury DIP Credit Agreement shall each be contributed to the Reorganized Debtor pursuant to the terms of the Contribution Agreement for one-hundred percent (100%) of the New Equity and Preferred A Stock having a stated value of $500,000 in each case pro rata based on the principal outstanding under their respective DIP Facilities.  On the Effective Date CMI and Westbury shall enter into a shareholder agreement that, among other things, provides for: (i) CMI and its affiliates to elect two members to the Reorganized Debtor's board of directors and for Westbury to elect one member of the Reorganized Debtor's board of directors; and (ii) setting forth the transactions that require unanimous approval of the Reorganized Debtor's board of directors.  The New Common Stock and Preferred A Stock shall be issued to CMI and Westbury free and clear of all liens, claim and encumbrances.

### C.      Exit Capital Contributions

On the Effective Date CMI will contribute pursuant to the Contribution Agreement $500,000 to the Reorganized Debtor in exchange for Preferred A Stock having an equivalent value.  On the Effective Date Westbury will contribute pursuant to the Contribution Agreement $1,000,000 to the Reorganized Debtor in exchange for Preferred A Stock having an equivalent stated value.  The Preferred A Stock shall be issued to CMI and Westbury free and clear of all liens, claims and encumbrances.

### D.      Payment of the DIP Facility Evidenced by the TCB DIP Credit Agreement

On the Effective Date, the obligations evidenced by the TCB DIP Credit Agreement, to the extent drawn during the Case, shall be paid off in full.

### E.      Issuance of New Equity

The issuance of the New Equity as contemplated by the Plan, by Reorganized Debtor is authorized without the need for any further corporate action or without any further action by a Holder of Claims or Interests. On the Effective Date, or as soon as reasonably practicable thereafter, the New Equity shall be issued to the DIP Lenders in accordance with the Plan.

### F.     Section 1145 Exemption

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Equity as contemplated herein shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration before the offering, issuance, distribution, or sale of securities. In addition, under section 1145 of the Bankruptcy Code, the New Equity, will be freely tradable by the recipients thereof, subject to (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (2) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (3) the restrictions, if any, on the transferability of such securities and instruments; and (4) applicable regulatory approval.

### G.     Corporate Existence

Except as otherwise provided herein, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state law).

### H.     New Certificate of Incorporation

On or immediately before the Effective Date, Reorganized Debtor will file its new certificates of incorporation with the Delaware Secretary of State and/or other applicable authorities in its state of incorporation in accordance with the corporate laws of the state of incorporation. After the Effective Date, Reorganized Debtor may amend and restate its new certificates of incorporation and new by-laws and other constituent documents as permitted by the laws of its state of incorporation and its new certificates of incorporation and new by-laws.

### I.     Reorganized Debtor's Board of Directors

To the extent known, the identity of the members of Reorganized Debtor's board of directors, which shall only come into effect after the Effective Date, and the nature and compensation for any member of the board who is an "insider" under section 101(31) of the Bankruptcy Code will be identified in a pleading filed with the Bankruptcy Court within ten (10) days of the Confirmation Hearing.

### J.     Officers of Reorganized Debtor

To the extent known, the identity of the members of Reorganized Debtor's board of directors, which shall only come into effect after the Effective Date, and the nature and

compensation for any member of the board who is an "insider" under section 101(31) of the Bankruptcy Code will be identified in a pleading filed with the Bankruptcy Court within ten (10) days of the Confirmation Hearing.

### K.     Vesting of Assets in Reorganized Debtor

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in each Estate, all Causes of Action (except those released pursuant to the Releases by the Debtors), shall vest in Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances, except for the Liens, Claims, charges and other encumbrances set forth in this Plan. On and after the Effective Date, except as otherwise provided in the Plan, Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### L.     Restructuring Transactions

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtor may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

### M.     Exemption from Certain Taxes and Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

### N.     D&O Liability Insurance Policies

Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors shall assume (and assign to the Reorganized Debtor if necessary to continue the D&O Liability Insurance Policies in full force) all of the D&O Liability Insurance Policies pursuant to section

365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair, or otherwise modify any obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed. On or before the Effective Date, the Reorganized Debtor may obtain reasonably sufficient tail coverage (i.e., D&O insurance coverage that extends beyond the end of the policy period) under a directors and officers' liability insurance policy for the current and former directors, officers, and managers for such terms or periods of time, and placed with such insurers, with the consent of the Requisite Initial Lenders, to be reasonable under the circumstances or as otherwise specified and ordered by the Bankruptcy Court in the Confirmation Order.

### O.    Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date and the Reorganized Debtor's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor. No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtor, as applicable, will not pursue any and all available Causes of Action against them. Except with respect to Causes of Action as to which the Debtors or Reorganized Debtor have released any Person or Entity on or before the Effective Date (including pursuant to the Releases by the Debtors or otherwise), the Debtors or Reorganized Debtor, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtor expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. The Debtors expressly reserve any and all causes of action they have under applicable federal and state law against Kenny Baker for breach of fiduciary duty and usurpation of corporate opportunities.

### 5.    Treatment of Executory Contracts and Unexpired Leases

### A.    Assumption and Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, each of the Debtors' Executory Contracts and Unexpired Leases shall be deemed assumed as of the Effective Date, unless such Executory Contract or Unexpired Lease: (i) was assumed or rejected previously by

the Debtors; (ii) previously expired or terminated pursuant to its own terms; or (iii) is the subject of a motion to assume filed on or before the Effective Date. Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions or rejections of such Executory Contracts and Unexpired Leases in the Plan are effective as of the Effective Date. Each such Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by such order. Notwithstanding anything to the contrary in the Plan, the Debtors or Reorganized Debtor, as applicable, reserve the right to alter, amend, modify or supplement the list of Executory Contracts and Unexpired Leases. Notwithstanding the foregoing paragraph, after the Effective Date, the Reorganized Debtor shall have the right to terminate, amend, or modify any intercompany contracts, leases, or other agreements without approval of the Bankruptcy Court.

**B.     Payments Related to Assumption of Executory Contracts and Unexpired Leases**

With respect to any Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant hereto or otherwise, Cure Claims shall be satisfied, pursuant to section 365(b) of the Bankruptcy Code, by payment of the Cure Claims in Cash on the Effective Date or as soon as reasonably practicable thereafter or on such other terms as the parties to each such Executory Contract or Unexpired Lease may otherwise agree. In the event of a dispute regarding: (1) the amount of any Cure Claim; (2) the ability of the Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365(b) of the Bankruptcy Code), if applicable, under the Executory Contract or the Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption, the Cure Claims shall be paid following the entry of a Final Order resolving the dispute and approving the assumption of such Executory Contracts or Unexpired Leases; provided, however, that the Debtors or the Reorganized Debtor may settle any dispute regarding the amount of any Cure Claim without any further notice or action, order, or approval of the Bankruptcy Court. Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

**C.     Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any nonbankruptcy law to the contrary, the Reorganized Debtor expressly reserves and does not waive any right to receive,

or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtor, as applicable, from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

### D.    Contracts and Leases Entered Into After the Petition Date

On and after the Effective Date, the Debtors may continue to perform under contracts and leases entered into after the Petition Date by any Debtor in the ordinary course of business, including any Executory Contracts and Unexpired Leases assumed by such Debtor.

### E.    Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### F.    Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtor, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided herein.

### G.    Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### H.        Rejection Claims Bar Date

Notwithstanding anything herein to the contrary, any Creditor holding a Rejection Claim must File a Proof of Claim on account of such Claim with the Bankruptcy Court on or before the thirty (30) days after the Confirmation Date. All Rejection Claims for which a Proof of Claim is not timely Filed will be forever barred from assertion against the Debtors or the Reorganized Debtor, their Estates, and their property unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Rejection Claims shall, as of the Effective Date, be subject to the discharge and permanent injunction set forth in the Plan.

6.        Provisions Governing Distributions

### A.        Record Date for Distributions

As of the entry of the Confirmation Order, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes made to reflect any new record holders of any Claims or Interests. The Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Voting Deadline.

### B.        Timing and Calculation of Amounts to Be Distributed

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VI hereof. Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### C.      Disbursing Agent

Except as otherwise provided herein, all distributions under the Plan shall be made by the Reorganized Debtor as Disbursing Agent or such other Entity designated by the Reorganized Debtor as a Disbursing Agent on the Effective Date. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. In the event that a Disbursing Agent is so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtor.

### D.      Rights and Powers of Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

### E.      Distributions on Account of Claims Allowed After the Effective Date

### (i)      Payments and Distributions on Disputed Claims

Notwithstanding any other provision of the Plan, no distributions shall be made under the Plan on account of any Disputed Claim, unless and until such Claim becomes an Allowed Claim. Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### (ii)      Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtors or the Reorganized Debtor, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

### F.      Delivery of Distributions and Undeliverable or Unclaimed Distributions

### (i)      Delivery of Distributions in General

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Reorganized Debtor or the applicable Disbursing Agent, as appropriate: (a) to the signatory set forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address); (b) at the addresses set forth in any written notices of

address changes delivered to the Reorganized Debtor or the applicable Disbursing Agent, as appropriate, after the date of any related Proof of Claim; (c) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Reorganized Debtor or the applicable Disbursing Agent, as appropriate, has not received a written notice of a change of address; or (d) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf. Distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors, the Reorganized Debtor, and the applicable Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

### (ii)     Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made as soon as practicable after such distribution has become deliverable or has been claimed to such Holder without interest; provided, however, such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the Effective Date. After such date, all "unclaimed property" or interests in property shall revert to the Reorganized Debtor (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

### G.     Withholding and Reporting Requirements

In connection with the Plan and all instruments issued in connection therewith, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.

### H.     Setoffs

The Debtors and the Reorganized Debtor may withhold (but not set off except as set forth below) from the distributions called for under the Plan on account of any Allowed Claim an amount equal to any claims, equity interests, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtor may hold against the Holder of any such Allowed Claim. In the event that any such claims, equity interests, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtor may hold against the Holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim) the amount of any adjudicated or resolved claims, equity interests, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtor may hold against the Holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount. Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtor of any such claims, equity interests, rights, and Causes of Action that the Debtors or the Reorganized Debtor may possess against any such Holder, except as specifically provided herein.

7.      **Procedures for Resolving Contingent, Unliquidated and Disputed Claims**

A.      **Prosecution of Objections to Claims**

The Debtors (before the Effective Date, in consultation with the Requisite Initial Lenders) or the Reorganized Debtor (on or after the Effective Date), as applicable, shall have the authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan. From and after the Effective Date, the Debtors and the Reorganized Debtor may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. The Debtors reserve all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

B.      **Allowance of Claims and Interests**

Except as expressly provided herein, no Claim shall be deemed Allowed unless and until such Claim is deemed Allowed under the Bankruptcy Code, under the Plan, or the Bankruptcy Court enters a Final Order in the Chapter 11 Cases allowing such Claim under section 502 of the Bankruptcy Code. Except as expressly provided herein or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), the Reorganized Debtor after the Effective Date will have and retain any and all rights and defenses held by the Debtors with respect to any Claim as of the Petition Date. All claims of any Entity that owes money to the Debtors shall be disallowed unless and until such Entity pays, in full, the amount it owes the Debtors.

### C.        No Distributions Pending Allowance

Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or distribution provided under the Plan shall be made on account of such Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim.

### D.        Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

### E.        Estimation of Claims

The Debtors (before the Effective Date, in consultation with the Requisite Initial Lenders) or Reorganized Debtor (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously Filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any party or Entity, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors (before the Effective Date) or the Reorganized Debtor (after the Effective Date), may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, objected to, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### F.        Expungement or Adjustment to Claims Without Objection

Any Claim that has been paid, satisfied or superseded may be expunged on the Claims Register by the Reorganized Debtor, and any Claim that has been amended may be adjusted thereon by the Reorganized Debtor, in both cases without a claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court. Beginning on the last day of the first full calendar quarter that is at least 90 days after the Effective Date, the Reorganized Debtor shall File every calendar quarter a list of all Claims or Interests that have been paid, satisfied, superseded or amended during such prior calendar quarter.

G.     **Deadline to File Objections to Claims**

Any objections to Claims shall be Filed no later than the Claims Objection Bar Date.

8.     Settlement, Release, Injunction and Related Provisions

A.     **Compromise and Settlement of Claims, Interests, and Controversies**

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtor may compromise and settle Claims against them and Causes of Action against other Entities.

B.     **Releases by Holders of Claims and Interests**

**As of the Effective Date, each Holder of a Claim or an Interest shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Reorganized Debtor, and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Debtors' Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Confirmation Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan. Nothing in the Confirmation Order or the Plan shall affect a release of**

**any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including any claim arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States or any state and local authority against the Debtors, the Reorganized Debtor, or Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States Government or any of its agencies or any state or local authority from bringing any claim, suit, action or other proceedings against the Debtors, the Reorganized Debtor or Released Parties for any liability whatever, including without limitation any claim, suit or action arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or any of its agencies or any state or local authority, nor shall anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or any of its agencies or any state and local authority against the Debtors, the Reorganized Debtor and Released Parties. This paragraph, however, shall in no way affect or limit the discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code.**

### C.      Exculpation

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim, obligation, cause of action, or liability for any Exculpated Claim, except for gross negligence or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Debtors and the Reorganized Debtor (and each of their respective Affiliates, agents, directors, officers, employees, advisors, and attorneys) have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the New Common Stock pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### D.      Discharge of Claims and Termination of Interests

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all other debts whether or not: (1) a Proof of Claim or Interest based upon such Claim,

debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests.

#### E.     Injunction

FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES AND HOLDERS OF CLAIMS ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION.

 THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND EQUITY INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF CLAIMS AND EQUITY INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING, WITHOUT LIMITATION, ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE EQUITY INTERESTS SHALL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE EQUITY INTERESTS SHALL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING, WITHOUT LIMITATION, ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTOR, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR EQUITY INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

#### F.     Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

G.      **Protection Against Discriminatory Treatment**

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtor or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtor or another Entity with whom such Reorganized Debtor have been associated, solely because one of the Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.      **Setoff and Recoupment**

Except with respect to Claims or payments allowed in or provided for under the Plan, the Debtors may setoff against or recoup from any Claims of any nature whatsoever that the Debtors may have against the claimant, but the failure to do so shall not constitute a waiver or release by the Debtors or the Reorganized Debtor of any such claim it may have against such claimant.  In no event shall any Holder of Claims or Interests be entitled to setoff any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or Reorganized Debtor unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise. In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtor unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtor Notice Person and the Committee Notice Person on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

I.      **Release of Liens**

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

9.      **Conditions Precedent to Confirmation of the Plan and the Effective Date**

A.      **Conditions Precedent to Confirmation**

It shall be a condition to Confirmation hereof that all provisions, terms and conditions hereof are approved in the Confirmation Order.

**B.      Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Article 9.C. of the Plan.

(i)      The Confirmation Order (a) shall be a Final Order in form and substance acceptable to the Debtors and (b) shall include a finding by the Bankruptcy Court that the Plan Securities to be issued on the Effective Date will be authorized and exempt from registration under applicable securities law pursuant to section 1145 of the Bankruptcy Code.

(ii)      All actions, documents, certificates, and agreements necessary to implement this Plan, including the execution of the Contribution Agreement by the parties thereto and the Reorganized Debtor's receipt of the contributions specified in Section 4.2 and 4.3 of the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

**C.      Waiver of Conditions**

Except as otherwise provided herein the conditions to Confirmation of the Plan and to Consummation of the Plan set forth in this Article may be waived at any time by the Debtors, provided, however, that the Debtors may not waive entry of the Order approving the Disclosure Statement, the Confirmation Order or any condition the waiver of which is proscribed by law; Any such waivers shall be evidenced by a writing, signed by the waiving parties, served upon the U.S. Trustee and Filed with the Bankruptcy Court. The waiver may be a conditional one, such as to extend the time under which a condition may be satisfied.

**D.      Effective Date**

The Effective Date shall be the date on which the Confirmation Order becomes a Final Order; and all the conditions specified in Article IX.B. have been satisfied or waived.

**E.      Effect of Failure of Conditions**

**If the Consummation of the Plan does not occur, the Plan shall be null and void.**

**ARTICLE 7**
**PROJECTED FINANCIAL INFORMATION**

The Debtors have attached their projected financial information as Exhibit C to this Disclosure Statement. The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources. Management developed a business plan and prepared financial projections (the "Projections") for the period from 2014 through 2019 (the "Projection Period").

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or projections to Holders of Claims or other parties in interest after the Confirmation Date or otherwise make such information public.

## ARTICLE 8
## RISK FACTORS

Holders of Claims and Interests should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together herewith, referred to or incorporated by reference herein, before voting to accept or reject the Plan. Although these risk factors are many, these factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

### A.    Risks Relating to Bankruptcy

### (i)    The Debtors may not be able to obtain confirmation of the Plan.

To emerge successfully from chapter 11 as a viable entity, the Debtors, like any debtor, must obtain approval of a plan of reorganization from their creditors and confirmation of the Plan through the Bankruptcy Court and must successfully implement the Plan. The foregoing process requires the Debtors to (a) meet certain statutory requirements concerning the adequacy of disclosure with respect to any proposed plan, (b) solicit and obtain creditor acceptances of the proposed plan and (c) fulfill other statutory conditions with respect to plan confirmation.

With regard to any proposed plan of reorganization, the Debtors may not receive the requisite acceptances to confirm a plan. If the requisite acceptances of the Plan are received, the Debtors intend to seek Confirmation of the Plan by the Bankruptcy Court. If the requisite acceptances are not received, the Debtors may nevertheless seek Confirmation of the Plan notwithstanding the dissent of certain Classes of Claims. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class of Claims if it determines that the plan satisfies section 1129(b) of the Bankruptcy Code. To confirm a plan over the objection of a dissenting Class, the Bankruptcy Court also must find that at least one impaired Class has accepted the plan, with such acceptance being determined without including the acceptance of any "insider" in such Class.

Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court might not confirm the Plan as proposed. A dissenting Holder of a Claim against the Debtors could challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code. Finally, even if the Bankruptcy Court determined that the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met. Specifically, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that (a) the Debtor's plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting Classes, (b) confirmation of the Debtor's plan is not likely to be followed by a liquidation or a need for further financial reorganization and (c) the value of distributions to non-accepting Holders of Claims within a particular Class under the Debtor's plan will not be less than the value of distributions such Holders would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. The Bankruptcy Court may determine that a proposed plan does not satisfy one or more of these requirements, in which case the proposed plan would not be confirmed by the Bankruptcy Court. If the Plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors would be able to reorganize their businesses and what, if any, distributions Holders of Claims ultimately would receive with respect to their Claims. There also can be no assurance that the Debtors will be able to successfully develop, prosecute, confirm and consummate an alternative plan of reorganization that is acceptable to the Bankruptcy Court and the Debtors' creditors and other parties in interest. Additionally, it is possible that third parties may seek and obtain approval to terminate or shorten the exclusivity period during which only the Debtors may propose and confirm a plan of reorganization. Finally, the Debtors' emergence from bankruptcy is not assured. While the Debtors expect to emerge from bankruptcy in the future, there can be no assurance that the Debtors will successfully reorganize or when this reorganization will occur.

       (ii)       **The Conditions Precedent to the Effective Date of the Plan may not occur.**

As more fully set forth in the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not occur. Specifically, Evolve and Westbury may elect not to fund the post Effective Date capital infusions.

**(iii)    Historical Financial Information of the Debtors may not be comparable to the Financial Information of the Reorganized Debtor.**

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtor from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

**B.    Risks Related to the Reorganized Debtor's Business**

**(i)    The Debtors may not be successful in implementing their business plan and may not achieve the financial projections set forth in this Disclosure Statement.**

The Reorganized Debtor's business plan recognizes that the principal opportunity for growth lies in using the Reorganized Debtor's position in the market to capitalize on a the hospice segment of the healthcare industry, which the Debtors expect to grow in the future due to population demographics.  Over the past several years, the Debtors have been implementing a strategy of acquiring competitors to increase patient counts. The Reorganized Debtor's business plan will require continued increases in patient counts.  There can be no assurance that the Reorganized Debtor will be successful in implementing its business plan.

If the Reorganized Debtor does not successfully implement its business plan, its financial condition and results of operations will likely fall short of the projections attached in Exhibit C to this Disclosure Statement.

**(ii)    The Debtors Operate in a Competitive Business Environment**

The Debtors compete for patients with other providers of home medical equipment. The Debtors' ability to compete successfully for patients depends in part upon access to a supply of home medical equipment and good relationships with hospice providers. Many of the Debtors' competitors have stronger financial and operational resources to the Debtors, which may enable them to compete more effectively for patients with the hospice providers. The Debtors can provide no assurance that they will be able to compete successfully for patients with hospice providers.

**C.    Risks Related to Financial Information**

**(i)    The Financial Information is based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit was Performed**

The financial information contained in this Disclosure Statement has not been audited. In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

**(ii)      Financial projections and other forward looking statements are not assured and are subject to inherent uncertainty due to the numerous assumptions upon which they are based and, as a result, actual results may vary materially from the projections**

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtor's operations, including the projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates. Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtor may turn out to be materially different from the financial projections. Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtor, some of which may not materialize, including, without limitation, assumptions concerning: (a) the timing of Confirmation and Consummation of the Plan in accordance with its terms; (b) the Reorganized Debtor's ability to maintain or increase revenues and gross margins, control future operating expenses or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; and (e) the Reorganized Debtor's ability to increase patient counts.

**(iii)      No Legal or Tax Advice Is Provided by this Disclosure Statement.**

This Disclosure Statement is not legal advice to any person. The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

## ARTICLE 9
## REQUIREMENTS OF CONFIRMATION OF THE PLAN

Among the requirements for the Confirmation of the Plan are that the Plan (1) is accepted by all impaired Classes of Claims and Interests, or if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (2) is feasible, and (3) is in the "best interests" of Holders of Claims and Interests that are impaired under the Plan.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11 of the Bankruptcy Code; (2) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11 of the Bankruptcy Code; and (3) the Plan has been proposed in good faith. Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below:

• The Plan complies with the applicable provisions of the Bankruptcy Code.

• The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

The Plan has been proposed in good faith and not by any means forbidden by law.

• Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

• Either each Holder of an impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code, including pursuant to section 1129(b) of the Bankruptcy Code for Equity Interests deemed to reject the Plan.

• Each Class of Claims that is entitled to vote on the Plan will have accepted the Plan, or the Plan can be confirmed without the approval of the Class pursuant to section 1129(b) of the Bankruptcy Code.

• Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims and Priority Tax Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

• At least one Class of impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

• Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

• All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

### D.        Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the Bankruptcy Court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if each of the Debtor's chapter 11 cases were converted to a chapter 7 case and the assets of such Debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting Holder of a Claim or an Equity Interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare the Holder's liquidation distribution to the distribution under the Plan that the Holder would receive if the Plan were confirmed and consummated.

To estimate what members of each impaired Class of Claims would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if each of the Chapter 11 Cases were converted to a chapter 7 case under the Bankruptcy Code and each of the respective Debtor's assets were liquidated by a chapter 7 trustee (the "Liquidation Value"). The Liquidation Value of a Debtor would consist of the net proceeds from the disposition of the assets of the Debtor, augmented by any cash held by the Debtor.

The Liquidation Value available to Holders of Claims would be reduced by, among other things: (a) the Claims of secured creditors to the extent of the value of their collateral; (b) the costs, fees and expenses of the liquidation, as well as other administrative expenses of the Debtors' chapter 7 cases; (c) unpaid administrative expense Claims of the Chapter 11 Cases; and (d) priority Claims and priority tax Claims. The Debtors' costs of liquidation in chapter 7 cases would include the compensation of a chapter 7 trustee, as well as of counsel and other professionals retained by such trustee, asset disposition expenses, applicable taxes, litigation costs, Claims arising from the operation of the Debtors during the chapter 7 cases, and all unpaid administrative expense Claims incurred by the Debtors during the Chapter 11 Cases that are allowed in the chapter 7 cases. The liquidation itself would trigger certain priority Claims, such as Claims for severance pay, and would likely accelerate the payment of other priority Claims and priority tax Claims that would otherwise be payable in the ordinary course of business. These priority Claims and priority tax Claims would be paid in full out of the net liquidation proceeds, after payment of secured Claims, before the balance would be made available to pay other Claims or to make any distribution in respect of Equity Interests.

The Debtors believe that Holders of Claim will receive equal or greater value as of the Effective Date under the Plan than such Holders would receive in a Chapter 7 liquidation. The Debtors believe that in a Chapter 7 liquidation the only creditors that would get value are the Debtors' prepetition secured lenders and junior creditors would receive nothing on account of their Claims.

In summary, the Debtors believe that a chapter 7 liquidation of the Debtors would result in substantial diminution in the value to be realized by Holders of Claims entitled to distributions, as compared to the distributions contemplated under the Plan, because of, among other factors:

• the increased cost and expenses of liquidation under chapter 7 arising from fees payable to the chapter 7 trustee and the attorneys and other professional advisors to such trustee;

• additional expenses and Claims, some of which would be entitled to priority and which would be generated during the liquidation in connection with the cessation of the Debtors' operations;

• the erosion of the value of the Debtors' assets in the context of an expedited liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail;

• the adverse effects on the salability of portions of the business resulting from the possible departure of key employees and the attendant loss of customers and vendors;

• the cost and expense attributable to the time value of money resulting from a potentially more protracted chapter 7 proceeding than the estimated length of the Chapter 11 Cases; and

• the application of the rule of absolute priority under the Bankruptcy Code to distributions made in a chapter 7 liquidation.

Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims than would a liquidation under chapter 7.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, they may be liquidated pursuant to the provisions of a chapter 11 liquidating plan. In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation might result in larger recoveries than in a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to Holders of Claims under a chapter 11 plan of liquidation probably would be delayed substantially. Most importantly, the Debtors believe that any distributions to creditors in a liquidation scenario would fail to capture the significant "going concern" value of their business, which is reflected in the New Common Stock to be distributed under the Plan. Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

### E.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared the Projections, as set forth on Exhibit C. Based upon the Projections, the Debtors believe that the Reorganized Debtor will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### F.      Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A Class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of the claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. For a class of impaired equity interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by equity interest holders that hold at least two-thirds in amount of the allowed equity interests of such class, counting only those equity interests that actually voted to accept or reject the plan. Thus, a class of equity interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

### G.      Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it, provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims or Equity Interests that is impaired under, and has not accepted, the Plan.

H.      **No Unfair Discrimination**

Often referred to as the "vertical test," this test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

I.      **Fair and Equitable Test**

Often referred to as the "horizontal test," this test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in such class.

**(i) Secured Claims:**

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (1) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (2) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

**(ii) Unsecured Claims:**

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property, subject to the applicability of the "new value" exception.

**(iii) Equity Interests:**

The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either: (1) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (2) if the class does not receive the amount as required under (1) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

If any impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Exhibit or Schedule prior to confirmation of the Plan, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Dated September 9, 2013.

*/s/ Jeff West_____*
Jeff West, Chief Executive Officer
Med-Depot Holdings, Inc. and
Med-Depot, Inc.

Respectfully submitted,

*/s/ Keith M.Aurzada_____*
Keith M. Aurzada
State Bar No. 24009880

John C. Leininger
State Bar No. 24007544
Jay L. Krystinik
State Bar No. 24041279
Bryan Cave LLP
2200 Ross Ave., Suite 3300
Dallas, Texas 75201

**Attorneys for Debtors-in-Possession**